IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |
|---|---|
| MARYLAND PHYSICIAN'S EDGE, LLC, et al. | : |
| v. | : Civil Action No. DKC 17-2756 |
| NANCY BEHRAM, M.D. | : |

**MEMORANDUM OPINION**

Presently pending in this employment dispute case are cross motions for summary judgment and motions to seal. The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiffs/Counter-Defendants' motion for summary judgment will granted and Defendant/Counter-Plaintiff's motion for summary judgment will be granted in part and denied in part. The motions to seal will be granted as to all but one exhibit.

## I. Background[1]

Nancy Behram, M.D., Defendant/Counter-Plaintiff, is "a board-certified physician specializing in obstetrics and gynecology." (ECF No. 72-4, at 2). She co-owned an obstetrics and gynecological practice, OB-GYN Associates, P.A. ("OBA"), with two other physicians, Bradford Kleinman, M.D. and Carolyn Morales, M.D. (ECF

---

[1] Unless otherwise noted, the facts outlined here are undisputed. Additional facts are discussed in the analysis section below.

No. 2-1, at 6).  The three owners sold OBA to Maryland Physician's Edge, LLC and Advantia Health, LLC (collectively "MPE"), in May, 2014. (*Id.*).  Dr. Behram entered into three contractual agreements with MPE as part of the sale: (1) an asset purchase agreement entered jointly with Dr. Behram's OBA co-owners to dispose of OBA's non-medical assets (ECF No. 2-1); (2) a purchase agreement entered jointly with Dr. Behram's co-owners to dispose of OBA's medical assets (ECF No. 2-2); and (3) a senior physician employment agreement ("SPEA") entered independently and providing terms for Dr. Behram's employment with MPE following the sale (ECF No. 63-4).

Per the SPEA, Dr. Behram's employment with MPE "commence[d] as of the [e]ffective [d]ate" of the SPEA and would "continue for a period . . . of five (5) years[.]" (ECF No. 63-4, at 10).  The SPEA's preamble initially defines the "Effective Date" as May 29, 2014.  Id. at 2.  Later in the preamble, however, the SPEA states that "this Agreement shall be effective as of the closing date of the Transaction (the "Effective Date"), which date shall be confirmed by a letter from the Employer to the Physician[.] *Id*. The closing date was September 2, 2014.  (ECF No. 64-4, at 316:7-11).

Nearly three years later, in the spring of 2017, MPE attempted to renegotiate their employment agreement with Dr. Behram.  Dr. Behram felt "pressured and bullied into signing a new contract" at

this time. (ECF No. 64-4 at 57:3-4). Dr. Behram began to consider her options for alternative employment. *Id*. at 57:9.

Dr. Behram's husband, Steve Behram, M.D., also owns an obstetrics and gynecology practice named Steve Behram, M.D. & Associates, PC. (ECF No. 72-12, at 13:12-13). Dr. Steve Behram's practice goes by the business name "Congressional OB-GYN."[2] (ECF No. 72-12, at 14:11). Congressional OB-GYN became affiliated with Privia Medical Group ("PMG") in January 2016. (ECF No. 72-12, at 46:1-20). In June, 2017, Dr. Behram spoke to Dr. Steve Behram and the chief financial officer of Privia Health[3], David Mountcastle, about the possibility of employment with Congressional. (ECF No. 72-13, at 2-3). As part of these discussions, Dr. Behram sent her employment agreement as well as certain of her "productivity reports," to PMG. (ECF No. 72-4, 72-11, 72-12).

In mid-July, Dr. Behram reset her Council for Affordable Quality Healtchare ("CAQH") password as part of the necessary re-credentialing process that would come with a change of employment. (ECF No. 63-1, at 2). Tracy Moran, an administrator who had worked with Dr. Behram for years, had, up until that point, been the primary manager of Dr. Behram's CAQH account. (ECF No. 63-20, at

---

[2] Dr. Steve Behram also owns Congressional Ambulatory Surgery Center, but the OB-GYN practice is "separate and apart" from the ambulatory surgery center. (ECF No. 72-12, at 17:6).

[3] The corporate relationship between PMG and Privia Health is not spelled out in the material before the court.

24).  On discovering that the password had been reset, Ms. Moran grew suspicious.  (ECF No. 63-20, at 27-28).

Following a series of confused communications which appeared to link Dr. Behram to her husband's practice at Congressional OB-GYN, Ms. Moran confronted Dr. Behram.  In the ensuing conversation, Ms. Moran "said I assume you are trying to go with Steve and that is what prompted all of this." (ECF No. 72-5, at 217:9-13).  Dr. Behram responded to Ms. Moran by stating that she had "not done anything with CAQH" and that she had "not signed anything with Privia."  *Id*.  Ms. Moran reported this information to MPE executives Brent Westhoven, Sean Glass, and Peter Glass.  (ECF No. 72-19, at 88:2-13).  MPE launched an investigation following Ms. Moran's report.  The investigation revealed certain suspicious statements Dr. Behram had made to patients about potentially leaving MPE.  (ECF No. 72-11, 30:19-22, 31:1-9).

MPE terminated Dr. Behram on July 31, 2017 for "violation of section 7(d)(vi)(A) and (F) of the [SPEA.]" (ECF No. 22-2, at 2).  Section 7(d)(vi)(A) provided MPE the ability to terminate Dr. Behram's employment immediately if MPE made a good faith determination that she "engaged in any act of personal dishonesty, gross negligence, or willful misconduct that ha[d] a material adverse effect on [MPE], its business operations, financial condition, assets, prospects or reputation[.]" (ECF No. 22-1, at 12).  Similarly, section 7(d)(vi)(F) provided MPE the ability to

terminate Dr. Behram immediately if MPE made a good faith determination that she "knowingly disclosed any confidential or other similar information, or breached any covenant against competition or solicitation, including a violation of" the restrictive covenants listed in the SPEA. (ECF No. 22-1, at 12).

Before her termination, Dr. Behram downloaded a filtered and cultivated list of certain MPE patients. (ECF No. 22, at 6). Dr. Behram also sent the aforementioned "productivity reports" which contained financial information about MPE, its services, and Dr. Behram's work for MPE, to Privia while still employed at MPE. (ECF No. 64-4, at 74-75).

Subsequently, MPE filed a complaint against Dr. Behram on September 15, 2017, alleging seven counts: (1) misappropriation of trade secrets under 18 U.S.C. § 1836, et seq. ("DTSA"); (2) misappropriation of trade secrets under the Maryland Commercial Code, §§ 11-201, et seq. ("MUTSA"); (3) breach of employment agreement contract; (4) breach of non-medical asset purchase agreement contract; (5) breach of medical asset purchase agreement contract; (6) injunctive relief; and (7) breach of implied covenant of good faith and fair dealing. (ECF No. 1, at 12-19). In response, Defendant/Counter-Plaintiff filed an answer and counterclaim on October 19, 2017, alleging five counts: (1) declaratory judgment; (2) breach of contract; (3) violation of the Maryland Wage Payment Collection Law; (4) tortious interference

with business expectancy; and (5) injunctive relief and specific performance. (ECF No. 22, at 25-36).

## II. Motions to Seal

MPE and Dr. Behram filed motions to seal. A motion to seal must comply with Local Rule 105.11, which provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections. The Court will not rule upon the motion until at least 14 days after it is entered on the public docket to permit the filing of objections by interested parties. Materials that are the subject of the motion shall remain temporarily sealed pending a ruling by the Court. If the motion is denied, the party making the filing will be given an opportunity to withdraw the materials.

This rule endeavors to protect the common law right to inspect and copy judicial records and documents, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), while recognizing that competing interests sometimes outweigh the public's right of access, *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir.1984).

Before sealing any documents, the court must provide the non-moving party with notice of the request to seal and an opportunity to object. *Id.* This notice requirement may be satisfied by either notifying the persons present in the courtroom or by docketing the motion "reasonably in advance of deciding the issue." *Id.* at 234.

Finally, the court should consider less drastic alternatives to sealing, such as filing redacted versions of the documents. If the court decides that sealing is appropriate, it should also provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives. *Id.* at 235.

Both parties seek to seal certain exhibits in connection with the cross-motions for summary judgment. Both motions stand unopposed after having been on the docket for several months, and one of the two motions is in fact a consent motion. All of the documents the parties wish to seal have been produced under a stipulated protective order under a "Confidential" designation. In this case, that designation is mostly fitting.

The exhibits which the parties seek to file under seal are: 1) a draft employee agreement, 2) an actual employee agreement, 3) a set of PowerPoint slides containing confidential terms, conditions, covenants and agreements among the parties, and 4) Dr. Behram's 2016 productivity reports, which, as discussed below, contain sensitive information and may indeed constitute trade secrets. Given that this action revolves in large part around MPE's efforts to prevent disclosure of these materials, it is appropriate to seal them here. *See Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F.Supp.2d 479, 485 (D.Md.2005) (sealing materials that went to "heart of th[e] case" concerning trade secrets); *Padco Advisors, Inc. v. Omdahl*, 179

F.Supp.2d 600, 614–15 (D.Md.2002) (sealing materials in action "based on enforcing a non-compete clause in an employment contract in order to protect these trade secrets").

Redacting, or taking other less restrictive measures, would defeat the usefulness of the bulk of the exhibits in a case such as this, where the court must get a complete view of these materials to understand whether MPE is correct that they never should have been disclosed.

On the other hand, redaction appears to be more fitting as to the PowerPoint slides comprising Exhibit 26. While the other exhibits are all, in some form, the basis of trade secret litigation, the power point slides are not, and the justification for their being sealed contains only boilerplate recitations. Neither the motions to seal, nor the information available to the court suggest that redaction would not provide sufficient protection. The parties shall have 21 days from the date of this order publicly to file redacted copies of the PowerPoint slides.

## III. Motions for Summary Judgment

### A.    Standard of Review

A motion for summary judgment will be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*,

532 F.3d 291, 297 (4th Cir. 2008). To prevail on a motion for summary judgment, the movant generally bears the burden of showing that there is no genuine dispute as to any material fact. *Liberty Lobby*, 477 U.S. at 248-50. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 249. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case ... which that party will bear the burden of proof at trial[,]" there can be no "genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

**B.    Dr. Behram's Motion for Partial Summary Judgment**

Dr. Behram seeks summary judgment as to four of MPE's claims. She does *not* seek judgment as a matter of law on any of her own claims, nor does she seek judgment on MPE's three other claims. For the following reasons, the court will grant Dr. Behram's summary judgment motion as to Counts VI and VII of MPE's Complaint as neither state cognizable, independent claims under Maryland law.  As to Counts I and II – the trade secret claims – the court will deny Dr. Behram's motion.

**1.    Trade Secret Claims (MPE Counts I and II)**

In their complaint, MPE alleges that the "confidential, proprietary, and trade secret information" that forms the basis of their Maryland Uniform Trade Secrets Act ("MUTSA") claim "relates to MPE's patient list."  (ECF No. 1, at 31).  Likewise, MPE's Defend Trade Secrets Act ("DTSA") claim focuses exclusively on patient lists.  *Id*. at 39.  Dr. Behram addresses her motion for summary judgment not just to the patient lists, but to the SPEA and certain "productivity reports" which Dr. Behram allegedly furnished to Privia.  (ECF No. 69-1, at 30).  In their reply in support of their motion for summary judgment, however, MPE makes no mention of the SPEA forming any basis of their MUTSA or DTSA claims, but *does* allege that the patient lists *and* productivity reports are trade secrets.  (ECF No. 73, at 38).  Only those two items will be considered.  Under both DTSA and MUTSA, plaintiff

must prove that the alleged trade secret meets the respective statutory definition. These definitions are similar, but distinct.

MUTSA defines as a trade secret as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> 2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md. Code Ann., Com. Law § 11-1201(e). The DTSA, by contrast, states:

> [T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

11

18 U.S.C. § 1839(3).

Both DTSA and MUTSA require not only the existence of a trade secret, but also "Misappropriation" of that trade secret. Both statutes define that term in substantially the same manner:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (i) Used improper means to acquire knowledge of the trade secret; or
> (ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
> 1. Derived from or through a person who had utilized improper means to acquire it;
> 2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> 3. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

MD. CODE ANN., COM. LAW Com. Law § 11-1201(c). *See also*, 18 U.S.C.A. § 1839(5)(A), (B)(i), (B)(ii)(I)-(II).

Dr. Behram, in her reply in support of her motion for summary judgment, argues that the productivity reports did not constitute trade secrets (ECF No. 72-2, at 52), that the productivity reports were not misappropriated, *Id.*, and that the patient lists were never "used or disclosed," *Id.* at 43. Dr. Behram concedes,

however, that "the patient list that Dr. Behram downloaded and kept in July 2017 should, for purposes of this Cross-Motion, be considered a 'trade secret.'"  Id. at 54.

### a.    The Patient Lists

Because Dr. Behram concedes that the patient lists constitute trade secrets, the only issue is whether Dr. Behram misappropriated the patient lists.  Importantly, disclosure to a third party is not essential to misappropriation: "Even if an employee does not disclose trade secrets to a third party, he can misappropriate those trade secrets if he knows or has reason to know he acquired them 'by improper means.'"  *Airfacts, Inc. v. de Amezaga*, 909 F.3d 84, 98 (4th Cir. 2018); *see also*, *LeJeune v. Coin Acceptors, Inc.*, 381 Md.288 (2004).

Dr. Behram argues that without use or disclosure, there can be no misappropriation.  (ECF No. 69-1, at 30).  This is an incorrect statement of the law.  MPE's claim sounds under the first listed definition of misappropriation: "Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  MD. CODE ANN., COM. LAW Com. Law § 11-1201(c)(1).  Maryland courts have made clear that *acquisition* alone is enough to give rise to a MUTSA claim. *See Bond v. PolyCycle, Inc.*, 127 Md. App. 365, 379 (1999) ("In order to qualify as misappropriation under MUTSA, one must either acquire the trade secret by improper means or disclose the trade

13

secret without express or implied consent") (quoting *Diamond v. T. Rowe Price Assocs.*, 852 F.Supp. 372, 412 (D.Md. 1994)).

That Dr. Behram "acquired" the patient list is conceded. Dr. Behram claims that she did not use "improper means" to acquire the patient list. Dr. Behram's motion for summary judgment, however, *also concedes* her improper motive for acquiring the patient list: "Dr. Behram saved the Patient List as an Excel spreadsheet file onto her personal laptop so that she would have this information if and when it became clear that her covenant against solicitation (as set forth in the SPEA) no longer applied." (ECF No. 69-1, at 12-13).

Dr. Behram's non-solicitation agreement is not related to MPE's trade secret claim. The expiration of a non-solicitation agreement does not constitute the expiration of a party's obligation not to misappropriate trade secrets. *LeJeune* makes clear that transferring files to one's personal computer for the purposes of future personal use constitutes "improper means." *LeJeune*, 381 Md. at 315. While Dr. Behram would be correct to say she can freely solicit former MPE patients on the expiration of her non-solicitation agreement, she cannot use something that she admits constitutes a trade secret to aid her in doing so.

In sum, Dr. Behram 1) concedes that the patient list is a trade secret, 2) concedes that she acquired that trade secret, and 3) concedes that she intended to put that trade secret to personal

use on the expiration of her non-solicitation agreement – a nonevent for the purposes of resolving this issue.

Accordingly, the motion for summary judgment on this aspect of MPE's trade secret claims is denied.

**b.  The Productivity Reports**

As with the patient lists, only one prong of the DTSA/MUTSA claim is contested: Dr. Behram concedes that she "disclosed" the productivity reports, so the only issue is whether the productivity reports constitute trade secrets.  In Maryland, "the six part test of the Restatement of Torts has continued to be applied in defining trade secrets" for the purposes of MUTSA.  *NaturaLawn of America, Inc. v. West Group, LLC*, 484 F.Supp.2d 392, 399 (D.Md. 2007). Those six parts are: 1) the extent to which the information is known outside of the employer's business; 2) the extent to which it is known by employees and others involved in the employee's business; 3) the extent of measures taken by the employer to guard the secrecy of the information; 4) the value of the information to the employer and the employer's competitor; 5) the amount of effort or money expended by the employer in developing the information; and 6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  Restatement (First) of Torts § 757 (1939).  Under the DTSA, trade secret status statutorily requires that the employer has "taken reasonable measures to keep such information secret," 18 U.S.C. § 1839(3)(A),

15

a requirement which tracks prongs two and three of the Restatement test.

In her motion for summary judgment and her reply in support of that motion, Dr. Behram advances two arguments against the productivity report constituting a trade secret: 1) MPE "did not label the . . . productivity reports as 'Confidential,'"; and 2) MPE "neither instructed nor advised Dr. Behram that she was prohibited from disclosing or sharing the contents of the . . . productivity reports." (ECF No. 72-2, at 52). Both of these arguments go strictly to the premise that MPE never took "reasonable measures" to keep the productivity reports secret.

MPE attempts to refute that premise by pointing out that 1) MPE only shares each physician's productivity report with that physician, and 2) MPE requires, through its employment agreements, that physicians not share company information, "which includes business and financial information[.]" (ECF No. 73, at 42-43).

MPE also addresses the other prongs of the Restatement test, arguing that a "productivity report provides extensive insight into MPE's business and financial information" as it contains information such as the number of procedures performed, certain information about the cost of those procedures, Dr. Behram's earnings from these procedures, as well as some essentially oblique patient information – how many patients were first time vs.

returning, and how many were telemedicine patients.  Id. at 39-40.

MPE relies on *LeJeune* for the proposition that "pricing information *can* constitute trade secrets." Id. at 40.  In *LeJeune*, however, the trade secrets at issue contained "a vast amount of information related to [the employer's] manufacturing costs and profit margins," and dealt with an industry that was "highly competitive and dominated by only two companies. Therefore, Coinco's cost and profit information, if available to Mars, could allow Mars to undercut all of Coinco's prices." *LeJeune*, 361 Md., at 309-10. It was the "unique, competitive nature of the currency acceptor industry," that the court found decisive in *LeJeune*.  *Id*.

Unlike in *LeJeune*, the productivity reports at issue here do not contain "a vast amount of information."  Each is only one page long and contains a limited amount of information about pricing and overhead.  Moreover, the OBGYN industry is markedly different from the currency acceptor industry in *LeJeune*.  Where the industry at issue cannot be reduced to a zero-sum battle between only *two* competitors, and where insurance compromises the usefulness of raw pricing data, it is safe to say that *LeJeune* is inapposite on the point of the value of the productivity reports to a competitor.

The burden, however, is on the moving party to establish that there is no genuine dispute as to any material fact.  Dr. Behram has not shown – as a matter of law – that MPE failed to take

reasonable measures to keep the report secret. Dr. Behram argues that "Plaintiffs did not label . . . the productivity reports as 'Confidential' in contrast to other documents in this case which the Practice chose to so label," (ECF No. 23, at 28), and that "Plaintiffs neither instructed nor advised Dr. Behram that she was prohibited from disclosing or sharing the contents of the . . . productivity reports, with the notable exception of Section 3(e) of the SPEA (which sets forth the terms and conditions governing the Retention Bonus.)" *Id*.

There are other notable exceptions, too. Section 3(d) of the SPEA states that:

> [a]ll files and records of *every type* pertaining to patients of the Employer for whom the Physician shall render services hereunder shall belong to the Employer, and the Physician shall not, during or after the Employment period, without the express written consent of the Employer and the patient, remove them from the Employer's office, copy them, allow them to be removed from the Employer's office, or allow them to be copied, except as reasonably required[.]

(ECF No. 63-4, at 4-5)(emphasis added). Section 7(d)(vi)(F) puts Dr. Behram on notice that she could be terminated for cause if she "knowingly disclosed any confidential or other similar information." *Id*. at 12. § 8(C) of the SPEA states that:

> The Physician covenant and agrees that during the Employment Period and after the termination or expiration thereof, he will not use, reveal, report, copy, publish or otherwise disclose to any person, firm,

> corporation or other entity certain valuable
> and confidential information of the Employer,
> including but not limited to patient lists,
> referral lists, employee lists, trade secrets,
> technical information, plans, files, records.
> . . fee schedules, contracts, personnel
> information, business and financial
> information of the Employer or any secret or
> confidential information of any kind used by
> the Physician during her employment.

*Id.* at 12-13.

There is nothing in either DTSA or MUTSA case law which suggests that marking something "confidential" is an irreducible requirement of finding an employer has taken reasonable measures to keep the alleged trade secrets secret.

Dr. Behram does not address – much less dispute – the provisions pertaining to the confidentiality of records "of every type" and of "business and financial information of the Employer[.]" Again, Dr. Behram's lone argument is that MPE did nothing to keep the productivity reports secret because they neither marked the productivity reports confidential nor instructed Dr. Behram that she was not to disclose them. (ECF No. 69-1, at 28). The above-referenced provisions of the SPEA plainly dispute that contention.

Accordingly, Dr. Behram's motion for summary judgment as to this aspect of MPE's trade secret claims is denied.

### 2. Breach of the Covenant of Good Faith and Fair Dealing (MPE Count VII)

Next, Dr. Behram asks for judgment as a matter of law on Count VII of MPE's complaint, breach of the covenant of good faith and fair dealing. MPE does not, based on their opposition, oppose this motion. As Dr. Behram correctly argues, Maryland recognizes that every contract imposes a duty of good faith and fair dealing in its performance. *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 534 (1964). However, Maryland courts have not explicitly recognized a separate cause of action for breach of this duty. *Abt Associates, Inc. v. JHPIEGO Corp.*, 104 F.Supp.2d 523, 534 (D.Md. 2000); *see also Baker v. Sun Co.*, 985 F.Supp. 609, 610 (D.Md.1997) ("Maryland does not recognize an independent cause of action for breach of the implied contractual duty of good faith and fair dealing.") Because MPE has failed to state a claim, this Count will be dismissed.

### 3. Injunctive Relief (MPE Count VI)

Finally, Dr. Behram moves for summary judgment on Count VI, "Injunctive Relief." Once again, this is not a standalone cause of action. Rather, it is a remedy which may be accorded after judgment. MPE now concedes as much, arguing that "should MPE prevail on the breach of contract claims contained in Counts III, IV and V, injunctive relief should comprise part of the remedy."

(ECF No. 73, at 46-47). Those Counts are not currently before this court. Count VI will be dismissed.

### C. MPE's Motion for Summary Judgment

MPE, through its motion for summary judgment, seeks judgment on Dr. Behram's counter complaint in its entirety. For the following reasons, MPE's motion will be granted.

### 1. Declaratory Judgment and Maryland Wage Payment Collection Law (Behram Counts I and III)

Dr. Behram seeks a declaration that her termination was "without cause on July 31, 2017." She further asks that court declare her entitled to both 90 days (the notice period required for "without case" termination) of salary, and to her retention bonus. Alternatively, she seeks a declaration that, if the termination was with cause, MPE "did not abide by the plain language of Section 7(d)(vi)(A) or 7(d)(vi)(F) . . . after a good faith determination by the employer and after notice has been provided to the physician."

The Declaratory Judgment Act, 28 U.S.C. § 2201, grants federal district courts the discretionary power to entertain declaratory judgment actions. *See*, *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). A federal court has discretion to entertain a declaratory judgment action if the relief sought (i) "'will serve a useful purpose in clarifying and settling the legal relations in issue'" and (ii) "'will terminate and afford relief from the uncertainty,

insecurity, and controversy giving rise to the proceeding.'" *Continental Casualty Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir.1994) (quoting *Nautilus Ins. Co. v. Winchester Homes*, 15 F.3d 371, 375 (4th Cir.1994)).   Likewise, under Maryland's Uniform Declaratory Judgment Act "[a]ny person interested under a . . . written contract . . . are affected by a . . . contract . . . may have determined any question of construction or validity under the . . . contract and obtain a declaration of rights, status, or other legal relations under it." MD. CODE. ANN., CTS & JUD. PROC. § 3-406. *See also*, *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 513 (D. Md. 2007) ("a federal court, insofar as it otherwise has jurisdiction over the parties, is equally authorized to entertain a declaratory judgment action involving the construction of a [contract]").

Regardless of which side prevails on the breach of contract issues, the court is authorized to issue an appropriate declaration:  "[t]he fact that the side which requested declaratory judgment did not prevail in court does not render a written declaratory of the parties' rights unnecessary." 22 Am. Jur. 2d *Declaratory Judgments* § 240. *Harford Mutual v. Woodfin*, 344 Md. 399, 414-415(1997) is instructive on this point:

> [W]hen a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, 'the trial court must render a declaratory judgment.' *Christ v. Department*, 335 Md. 427, 435, 644 A.2d 34, 38 (1994). '[W]here a party

requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of ... judgment in favor of the prevailing party.' *Ashton v. Brown*, 339 Md. 70, 87, 660 A.2d 447, 455 (1995), and cases there cited.

The fact that the side which requested the declaratory judgment did not prevail in the circuit court does not render a written declaration of the parties' rights unnecessary.  As this Court stated many years ago, 'whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made.' *Case v. Comptroller*, 219 Md. 282, 288, 149 A.2d 6, 9 (1959). *See also*, e.g., *Christ v. Department*, supra, 335 Md. at 435-436, 644 A.2d at 38 ('[t]he court's rejection of the plaintiff's position on the merits furnishes no ground for' failure to file a declaratory judgment); *Broadwater v. State*, 303 Md. 461, 467, 494 A.2d 934, 937 (1985) ('the trial judge should have declared the rights of the parties even if such declaration might be contrary to the desires of the plaintiff'); *East v. Gilchrist*, 293 Md. 453, 461 n. 3, 445 A.2d 343, 347 n. 3 (1982) ('where a plaintiff seeks a declaratory judgment ..., and the court's conclusion ... is exactly opposite from the plaintiff's contention, nevertheless the court must, under the plaintiff's prayer for relief, issue a declaratory judgment'); *Shapiro v. County Comm.*, 219 Md. 298, 302-303, 149 A.2d 396, 399 (1959) ('even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree').

*See also*, *PRSC, LLC v. Admiral, Inc.,* No. CV DKC 2008-1379, 2009

WL 10685578, at *6 (D.Md. Mar. 10, 2009) (citing *Maryland Ass'n of*

*Health Maint. Org. v. Health Serv. Cost Review Com'n*, 356 Md. 581, 603-604 (Md. 1999)).

Pursuant to the SPEA, Dr. Behram could be terminated for cause if MPE made a good faith determination that Dr. Behram engaged in "act[s] of personal dishonesty, gross negligence, or willful misconduct." (ECF No. 63-1, at 10). MPE argues that the record is undisputed that "MPE made a good-faith determination under the SPEA that Dr. Behram had engaged in personal dishonesty." *Id.*

Under settled Maryland law, in the employment context, courts are not to "act as super personnel officers, overseeing and second-guessing the company's decision." *MacGill v. Blue Cross of Maryland, Inc.*, 77 Md.App. 613, 620 (Md.Ct.Spec.App. 1989). Further, "courts should be reluctant to overturn an employer's decision to discharge an employee when the employer has complied with its own procedures for resolving matters such as this." *Elliott v. Bd. Of Trustees of Montgomery Cty. Cmty. Coll.*, 104 Md.App. 93, 108-09 (1995).

Perhaps most importantly, the question here is *not* whether Dr. Behram engaged in "acts of personal dishonesty." Rather, the question before the court is whether MPE made a good faith determination that Dr. Behram did so. *See Towson Univ. v. Conte*, 384 Md. 68, 87 (2004) (holding that the finder of fact is not "to reexamine in all its factual detail the triggering cause of the

decision to dismiss – including the retrospective accuracy of the employer's comprehension of that event[.]")

In determining whether MPE acted in good or bad faith, a few points are essential to keep in mind. First, "mere negligence or error does not constitute bad faith." *Wheeler v. Dynamic Eng'g. Inc.*, 62 F.3d. 634, 641 (4th Cir. 1995). Dr. Behram makes much of the MPE's alleged negligence in carrying out its brief – and, as Dr. Behram would have it, *too* brief – investigation which led to their determination. (ECF No. 72-2, at 29). To mandate a length of time that an employer must devote to an investigation of an "act of personal dishonesty" would be to engage in exactly the judicial second-guessing of employment decisions that Maryland courts have repeatedly prohibited. As *Wheeler* makes clear, even if MPE was negligent in its determination, that by no means signifies bad faith.

Second, while bad faith may be "evidenced by an intentional advancement of a baseless contention . . . made for ulterior purposes," *Childers v. MedStar Health, Inc.*, 289 F.Supp.2d 714, 718 (D.Md. 2003), a bare allegation of ulterior motive is not enough to withstand a motion for summary judgment. *See, e.g.*, *Banks v. Bethlehem Steel Corp.*, 870 F.2d 1438, 1445 (9th Cir. 1989). Dr. Behram makes just such a bare allegation, alluding to her belief that she was unjustly – even baselessly - pushed out, and that MPE's real reason for terminating her had nothing to do with an

act of personal dishonesty and everything to do with her refusal to renegotiate her employment agreement. (ECF No. 22, at 21-23).

The record does not support this allegation. In her own deposition, Dr. Behram recalls Ms. Moran's first confrontation regarding the change in the CAQH password as follows: "I told her that I have not done anything with CAQH. She said I assume you are trying to go with Steve and that is what prompted all of this. And I said I have not signed anything with Privia." (ECF No. 64-4, at 217).

Even if certain assumptions or interpretations of events in the course of MPE's investigation turned out to be wrong, it is clear from this conversation that MPE's and its employees' contemporaneous understanding prior to Dr. Behram's termination was that Dr. Behram was contemplating leaving MPE for Congressional OB-GYN, and that she was not being forthright about this potential move. What is more, Dr. Behram's own deposition testimony points to an "act of personal dishonesty" which MPE was right to be skeptical of: Dr. Behram told Ms. Moran that she had "not done anything with CAQH." *Id.* In fact, Dr. Behram had modified her CAQH password in the process of seeking out – or at least exploring the possibility of – employment with another practice. (ECF No. 72-2, at 20-21).

There is nothing in the record aside from Dr. Behram's baseless suspicions which suggests MPE operated with an ulterior

motive.  Rather, the record makes clear that they believed Dr. Behram to be acting dishonestly with regard to her seeking a new job at Privia.  MPE did not need the benefit of hindsight to realize this; the evidence available to them was enough, at the time, to form a good faith determination.

Even when taken in the light most favorable to Dr. Behram, the undisputed facts show that 1) MPE terminated Dr. Behram for acts of personal dishonesty and 2) MPE made a good faith determination that Dr. Behram had actually engaged in acts of personal dishonesty.  Accordingly, the court will grant summary judgment on Count I of Dr. Behram's counter complaint by declaring that MBE terminated her with cause.

Further, there is no genuine dispute of material fact as to whether MPE somehow breached the SPEA by failing explicitly to tell Dr. Behram that it had made a good faith determination or by failing to provide her "notice" of her termination.  The SPEA states simply that MPE may terminate Dr. Behram after making "[a] good faith determination. . . and after notice to the Physician[.]" (ECF No. 22-1, at 11).  Dr. Behram makes a confusing and conclusory argument that she could only be terminated "**after** a good faith determination by the employer and **after** notice has been provided to the physician, neither of which occurred here." (ECF No. 22, at 27) (emphasis in original).  She suggests that her termination letter "does not identify or describe the extent or nature of Dr.

Behram's alleged violation(s) . . . of the SPEA, and does not state that Plaintiffs conducted an investigation or otherwise made a 'good faith determination' as required by § 7(d)(vi) of that Agreement." (ECF No. 72-2, at 29).

There is nothing in the SPEA which requires MPE to detail any investigation and MPE's July 31, 2017 letter to Dr. Behram *did* provide Dr. Behram notice of the grounds for her termination: "violation of Section 7(d)(vi)(A) and (F) of the [SPEA.]" (ECF No. 69-26, at 2). Further, the SPEA is explicit that MPE "may terminate the Physician's employment *immediately* for any of the reasons listed below[.]" (ECF No. 22-1, at 10). To the extent Dr. Behram seems to imply that the SPEA required MPE to provide notice to her sooner – or that she was somehow terminated before her actual receipt of notice – her argument is unavailing. Immediately means immediately, and Dr. Behram was terminated *immediately* after receipt of notice in the form of MPE's July 31, 2017 letter.

As discussed above, there is no genuine dispute of material fact that MPE *did* in fact make a good faith determination. The SPEA simply does not require MPE to explain to Dr. Behram the details of their good faith determination to Dr. Behram.

Dr. Behram's claim for violation of the Maryland Wage Payment Collection Law also hinges on the "for cause" determination. Because the court finds that the termination followed a good faith

determination of cause, MPE had no obligation to provide 90 days' notice to Dr. Behram of her termination, and subsequently no obligation to pay Dr. Behram 90 days' of wages.

## 2. Breach of Contract (Behram Count II)

MPE next challenges Dr. Behram's claim for breach of contract. That claim arises out of MPE's failure to pay her the $150,000 retention bonus owed her "on the third (3rd) anniversary of the Effective Date of the Employment Agreement." (ECF No. 63-4, at 1). Again, the Effective Date is defined twice in the SPEA's preamble: first as May 29, 2014, and second as "the closing date of the Transaction" which the parties agree to be September 2, 2014. Critically, Dr. Behram's termination fell in between these two dates, meaning that she is owed $150,000 if the Effective Date is the former, and owed nothing if the Effective Date is the latter.

Under the objective theory of contract interpretation, unambiguous contract terms are given their plain meaning, regardless of the parties' intentions at the time the contract was formed. *See Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 448, (2008). The interpretation of a written contract is ordinarily a question of law for the court. *Suburban Hosp. v. Dwiggins*, 324 Md. 294, 306 (1991). Therefore, when interpreting a contract, the court's task is to "determine from the language of the agreement itself what a reasonable person in the position of

the parties would have meant at the time it was effectuated."
*Calomiris v. Woods*, 353 Md. 425, 436 (1999), (quoting *Gen. Motors Acceptance v. Daniels*, 303 Md. 254, 261 (1985)). "The true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id*.

In its interpretation, the court must look to the entire language of the agreement, not merely a portion thereof, *Jones v. Hubbard*, 356 Md. 513, 534-35 (1999), but parol evidence of the parties' intent or meaning should not be considered unless there is an ambiguity. *See Beale v. Am. Nat'l Lawyers Ins. Reciprocal*, 379 Md. 643, 660 (2004); *Bushey v. N. Assurance*, 362 Md. 626, 632 (2001); *see also Higgins v. Barnes*, 310 Md. 532, 537 (1987) ("[E]vidence is inadmissible to vary, alter, or contradict a contract that is complete and unambiguous.")

The first question, then, is to determine whether the contract is ambiguous. "A contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 885 F.3d 271, 277 (4th Cir. 2018). In determining whether the contract is ambiguous, the court must also examine "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718 (2007).

Taken as a whole, the contract cannot be said to be ambiguous on the basis of what reasonably appears to be a scrivener's error. To do so would be to render moot or nonsensical portions of the contract. The SPEA defines the "Employment Period" as starting on the "Effective Date." (ECF No. 63-4, at 9). The restrictive covenants Dr. Behram agreed to would make no sense if the Effective Date was May 29, 2014. As of that date, and in the ensuing months, Dr. Behram was running an independent, competing practice. In other words, she was "engag[ing] directly or indirectly in the practice of medicine in competition with the Employer[.]" Even if the court were to find an ambiguity in what all signs indicate is a scrivener's error, the parol and extrinsic evidence allows for no genuine dispute of material fact. Parol evidence regarding the parties' intent as of a week prior to the signing of the contract shows that the Effective Date was intended to be the closing date (ECF No. 63-6). And extrinsic evidence regarding the parties' understanding of the contract overwhelmingly demonstrates that the parties viewed September 2 as the Effective Date for the purposes of determining when Dr. Behram would be compensated.

Dr. Behram's alleged extrinsic evidence in contradiction of this amounts to no evidence at all: she points to a conversation with a non-party as well as her own declaration, given on October 29, 2018, that she "considered [her]self bound by the material

terms of this agreement as soon as it was signed on May 29, 2014."
Neither of these create a genuine dispute of material fact.

### 3. Tortious Interference with Business Expectancy (Behram Count IV)

Finally, MPE challenges Dr. Behram's claim that MPE has tortiously interfered with Dr. Behram's business expectancy by failing to inform patients regarding Dr. Behram's relocation. (ECF No. 22, at 31-32). In Maryland, the elements of tortious interference are 1) intentional and willful acts; 2) calculated to cause damages to the plaintiffs in their lawful business; 3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; and 4) actual damage and loss resulting. *See Nat. Design, Inc. v. Rouse Co.*, 302 Md. 47, 70-71 (1984).

The conduct that Dr. Behram puts forward as tortious is not an act, but an omission: MPE has *failed* to inform her former patients about her new practice. Dr. Behram attempts to turn an AMA ethical opinion into an affirmative duty to act. (ECF No. 22, at 31-32). That opinion holds that "[t]he patients of a physician who leaves a group practice *should* be notified that the physician is leaving the group. Patients of the physician *should* also be informed of the physician's new address . . . It is unethical to withhold such information *upon request of a patient*." AMA Ethical Opinion 7.03 ("Records of Physician Upon Retirement or Departure

from a Group") (emphasis added).  There is nothing in the record to suggest that MPE has refused any patient's request for information regarding Dr. Behram.  Thus, there is no indication that MPE has even acted unethically, much less tortiously.

The issue of whether an AMA ethical opinion *can* give rise to an affirmative duty to act is not before the court.  The sole issue here is whether this particular AMA ethical opinion creates an affirmative duty, the breach of which gives rise to a tort claim under Maryland law, under these circumstances.  It does not.

The kind of conduct which gives rise to a tortious interference claim "must be conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Baltimore Sports & Social Club, Inc. v. Sport & Social, LLC*, 228 F.Supp.3d 544 (D.Md. 2017).  Simply failing to proactively inform former patients of a doctor's new address is not sufficiently wrongful under this rubric, especially when the AMA does not even go so far as to proscribe such conduct as "unethical."

## IV.  Conclusion

For the foregoing reasons, Defendant/Counter-Plaintiff's motion to seal will be granted, Plaintiff/Counter-Defendant's and Defendant/Counter-Plaintiff's consent motion to seal will be granted in part and denied in part, Plaintiff/Counter-Defendants' motion for summary judgment will be granted and Defendant/Counter-

Plaintiff's motion for summary judgment will be granted in part and denied in part.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
